**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 18-** |
| | : | |
| **v.** | : | **VIOLATION:** |
| | : | **18 U.S.C. § 201** |
| **MICHELLE STEVENS,** | : | **(Bribery)** |
| | : | |
| **Defendant.** | : | **FORFEITURE:** |
| | : | **18 U.S.C. § 981(a)(1)(C); 28 U.S.C.** |
| | : | **§ 2461(c); 21 U.S.C. § 853(p)** |

**INFORMATION**

The United States charges that:

**General Allegations**

1.     Unless stated otherwise, the relevant time period for this Statement of Offense spans from in or about March 2016 through in or about January 2018.

**Eelon Wellness and Massage, Eelon Training Academy, and Its Employees**

2.     Eelon Wellness and Massage and Eelon Training Academy (collectively "Eelon") were privately owned, non-accredited schools purporting to specialize in health and wellness, and digital media, respectively.  Eelon was registered to do business in the State of Maryland. Beginning no later than in or about 2016 to in or about January 2017, Eelon operated at 3611 Branch Avenue, Suite 207, Temple Hills, Maryland 20748.  From in or about January 2017 to in or about January 2018, Eelon operated at 3100 Branch Avenue, Temple Hills, Maryland 20748.

3.     At all relevant times the defendant, Michelle Stevens ("STEVENS"), was the sole owner of Eelon, and controlled all of its finances and operations.

4.     EELON EMPLOYEE 1 was STEVENS' son and worked at Eelon as an administrator beginning in or about April, 2017.

1

5.     EELON EMPLOYEE 2 was an instructor at the school who lived in California.  He became an employee in or about April, 2017.

6.     During the relevant time period, up to five paid employees and unpaid interns worked at Eelon at any given time.  STEVENS supervised all of Eelon's employees and interns, all of whom reported directly to STEVENS.  STEVENS determined all Eelon employees' and interns' job descriptions, salaries, benefits, and work schedules.

**Vocational Rehabilitation and Employment Program and Its Employees**

7.     At all relevant times the U.S. Department of Veterans Affairs ("VA") was an agency of the United States Government.

8.     At all relevant times the Vocational Rehabilitation and Employment ("VR&E") program was authorized by Congress under Title 38, United States Code, Chapter 31.  The VR&E program provided eligible veterans with services and assistance necessary to enable them to achieve maximum independence in daily living and to obtain and maintain suitable employment. VR&E program benefits were available to veterans who served in the military after September 16, 1940, and who did not receive a dishonorable discharge.  In order to qualify for these benefits a veteran must have had a service-connected disability and a serious employment handicap requiring rehabilitation.

9.     One type of service offered to qualifying veterans by the VR&E program was educational and vocational training.  In cases where educational and vocational training was determined to be necessary for the veteran to accomplish the purposes of the rehabilitation program, the VA paid for tuition, books, supplies, equipment, and other educational costs and fees for a veteran to attend a school operated by an approved program vendor.  The VA paid tuition and fees directly to the school on the enrolled veteran's behalf, and sometimes also paid the school

directly for an enrolled veteran's books, supplies, and equipment.  Veterans participating in the VR&E program received a subsistence allowance while they pursued an education or training program.  The subsistence allowance was a monthly payment calculated based on the rate of attendance in a training program (full-time, three-quarter-time, or half-time), the number of dependents, and the type of training.

10.     Eelon became an approved VR&E program vendor on or about March 22, 2016.

11.     Each VR&E program vendor that received tuition payments from the VA was required to designate a School Certifying Official.  School Certifying Officials certified the accuracy of information submitted for purposes of payment by the vendor to the VA.  For example, school vendors such as Eelon submitted VA Form 28-1905s to certify that veteran students were enrolled in specified classes for specified class hours during specified dates.  STEVENS was Eelon's School Certifying Official from in or about March 2016 until in or about January 2018.  As a School Certifying Official, STEVENS also submitted to the VA invoices reflecting veterans' course schedules, course tuition, and the costs of equipment and supplies that Eelon purported to purchase for veterans.

12.     PUBLIC OFFICIAL 1 was a VR&E program counselor employed by the VA.  VR&E program counselors such as PUBLIC OFFICIAL 1 were responsible for providing rehabilitation and counseling services to veterans.  These services included comprehensive evaluations, entitlement determinations, educational counseling, vocational counseling, rehabilitation planning, job placement, and case management.  Each counselor was assigned to a certain number of educational institutions.  PUBLIC OFFICIAL 1 was assigned to Eelon.  As part of PUBLIC OFFICIAL 1's duties as a VR&E program counselor, PUBLIC OFFICIAL 1 reviewed invoices submitted by Eelon and had the authority to approve or deny invoices.  PUBLIC

3

OFFICIAL 1 was also responsible for advising veterans under his supervision which school they should attend.

13.     VETERAN 1 was a veteran enrolled in the VR&E program who took three courses at Eelon for which the VA paid tuition. PUBLIC OFFICIAL 1 supervised VETERAN 1 in PUBLIC OFFICIAL 1's capacity as a VR&E program counselor. As further described below, VETERAN 1 introduced STEVENS to PUBLIC OFFICIAL 1 and served as PUBLIC OFFICIAL 1's personal assistant for purposes of the scheme.

### The Scheme to Commit Bribery and Defraud the VA

16.     In or about 2014, VETERAN 1 and PUBLIC OFFICIAL 1 met with STEVENS at 3611 Branch Avenue, Suite 207, Temple Hills, Maryland. During this meeting, PUBLIC OFFICIAL 1 proposed to STEVENS that STEVENS open a school that would be approved by the VA to serve as a vendor for the VR&E program. PUBLIC OFFICIAL 1 explained to STEVENS that veterans would attend STEVENS' school and that their tuition would be paid to STEVENS by the VA. STEVENS was not operating any school of any kind at this time. At a subsequent meeting between PUBLIC OFFICIAL 1 and STEVENS, in or about early 2016, STEVENS agreed to begin the process of creating a school to serve as an approved vendor for the VR&E program.

17.     STEVENS first became a certified VR&E vendor on March 22, 2016, using the school name Eelon Wellness and Massage. PUBLIC OFFICIAL 1, in his official capacity as a VR&E program counselor, initiated and facilitated the vendor approval process for Eelon Wellness and Massage. At this time, Eelon Wellness and Massage was not operating as a school and did not have any students.

18.     On or about July 1, 2016, VETERAN 1 enrolled in Eelon Wellness and Massage's "Health Practitioner" courses through the VR&E program, with PUBLIC OFFICIAL 1 serving as

VETERAN 1's program counselor.  When VETERAN 1 enrolled at Eelon Wellness and Massage, he was the only student at the school.  On or about June 27 and July 1, 2016, STEVENS prepared and sent PUBLIC OFFICIAL 1 invoices reflecting the costs and planned course of study for VETERAN 1's course.  In these documents, STEVENS purposely inflated the hours of class that VETERAN 1 would attend.  STEVENS represented that VETERAN 1 would attend class for approximately forty hours a week, when in actuality VETERAN 1 only attended no more than eight hours of class per week.

19.    On or about August 4, 2016, STEVENS emailed PUBLIC OFFICIAL 1 to try to find out why EELON EMPLOYEE 1, who had attempted to enroll at Eelon Wellness and Massage through the VR&E program, had been denied enrollment by the VA.  By that time, EELON EMPLOYEE 1 had already enrolled at Eelon Wellness and Massage with his tuition paid in part by another veterans' organization.  EELON EMPLOYEE 1's application, which was originally submitted to another VR&E counselor, had not been approved.  STEVENS attempted to enroll EELON EMPLOYEE 1 with PUBLIC OFFICIAL 1's help in an attempt to be paid the balance of EELON EMPLOYEE 1's tuition.  Ultimately, PUBLIC EMPLOYEE 1 was not able to enroll EELON EMPLOYEE 1 in the VR&E program.

20.    On or about September 2, 2016, STEVENS received by electronic transfer a tuition payment from the VA for VETERAN 1's Health Practitioner course tuition in the amount of $28,100.  In or about September 2016, STEVENS called PUBLIC OFFICIAL 1 by telephone and asked how she could "bless" him in return for facilitating the VA's payment of VETERAN 1's tuition.  PUBLIC OFFICIAL 1 responded that she should give him seven percent of the monies paid by the VA to STEVENS.

21.     On September 2, 2016, STEVENS opened a new bank account and deposited the $28,100 from the VA, which represented the account's starting balance. Only STEVENS had access to this account. By September 14, 2016, STEVENS had overdrawn the account. All of the withdrawals between September 2, 2016, and September 14, 2016, were for STEVENS' personal benefit, such as restaurant meals, clothes, and the repayment of a debt for automobile tires. None of the withdrawals were related to educating VETERAN 1 via a health practitioner course.

22.     In or about September 2016, following her phone conversation with PUBLIC OFFICIAL 1 regarding how much he expected her to pay him for getting her paid by the VA STEVENS met PUBLIC OFFICIAL 1 at his office located at 1722 Eye Street N.W., Washington, D.C., and handed him $1,500 cash. The sole purpose of this payment was to pay PUBLIC OFFICIAL 1 in return for his official acts to facilitate the payment of funds from the VA to STEVENS, in furtherance of PUBLIC OFFICIAL 1 and STEVENS' illicit agreement to commit bribery and defraud the VA.

23.     One of the ways that STEVENS attempted to defraud the VA was to seek payment for services for which she had already been paid. For example, on or about January 28, 2017, STEVENS submitted an invoice for VETERAN 1's Advanced Health Practitioner course. This invoice listed two classes that the VA had, in 2016, paid STEVENS for providing to VETERAN 1, and which VETERAN 1 had not taken to date.

24.     In or about April 2017, STEVENS renamed her school Eelon Training Academy and refashioned it as a school purporting to provide "digital media" classes. STEVENS' only formal training in digital media was a ten-week part-time course at the Columbia School of Broadcasting. To that point, no other student had attended Eelon Wellness & Massage as a tuition-

paying student other than VETERAN 1 and STEVENS' son, whose tuition was partially paid by a nonprofit that supports veterans' education.

25.      On or about May 5, 2017, STEVENS received into an overdrawn bank account, by electronic transfer, a tuition payment from the VA for a veteran student's digital media course tuition in the amount of $25,000.  By May 12, 2017, STEVENS had drawn the account balance down to less than $500.  No more than $10,500 (representing payments to EELON EMPLOYEES 1 and 2, and a third Eelon employee) of these withdrawals related to providing VETERAN 1 or any other VR&E program veteran with educational benefits.

26.      In or about March 2017, STEVENS met PUBLIC OFFICIAL 1 in a parking lot near Arundel Mills Mall in Hanover, Maryland, and handed $1500 to PUBLIC OFFICIAL 1.  At this meeting, PUBLIC OFFICIAL 1 referred to the money he directed her to pay him as a "fee." The sole purpose of this payment was the "fee" to PUBLIC OFFICIAL 1 in return for his official acts to facilitate the payment of funds from the VA to STEVENS, in furtherance of PUBLIC OFFICIAL 1 and STEVENS' illicit agreement to commit bribery and defraud the VA.

27.      On or about June 15, 2017, STEVENS submitted to PUBLIC OFFICIAL 1 a VA Form 28-1905 for VETERAN 1 to take a course in digital media.  On or about July 13, 2017, STEVENS submitted to PUBLIC OFFICIAL 1 an invoice in the amount of $34,425 for the digital media course.  PUBLIC OFFICIAL 1 approved the payment for VETERAN 1's tuition.

28.      Between in or about June 2017 and in or about January 2018, PUBLIC OFFICIAL 1 enrolled a total of seven students, including VETERAN 1, in Eelon Training Academy, purportedly to take a digital media course.  STEVENS submitted VA Form 28-1905s, course schedules, and other paperwork for each student.  STEVENS knowingly submitted, and PUBLIC OFFICIAL 1 knowingly processed and approved, paperwork inflating the number of weekly class

hours that STEVENS planned for students to attend class in an effort to achieve a "full-time" designation for the students. For example, STEVENS represented to the VA that students would be attending class for forty hours per week, knowing that in fact they would attend class for a maximum of eight weekly hours. And, in fact, several of the students did not attend the majority of the scheduled class sessions due to the poor quality of the education provided by Eelon Training Academy and the building frequently being locked and vacant on scheduled class days.

29.     STEVENS lived in Florida for most of the relevant time period and was not physically present at Eelon Training Academy for the majority of the scheduled digital media courses. Despite learning that classes were not being conducted as scheduled, due in part to the building being locked and vacant when students arrived, and despite knowing that several of the students stopped attending class before the halfway point in the course, STEVENS never alerted the VA to these shortcomings.

30.     STEVENS moved back to Maryland in or about October 2017 to personally run Eelon Training Academy. Despite STEVENS being available to supervise EELON activities in-person, classes were still not conducted as scheduled after October 2017.

31.     In furtherance of the scheme to bribe PUBLIC OFFICIAL 1 and defraud the VA, and in an attempt to maximize her profits from the scheme, STEVENS submitted invoices to the VA amounting to no less than $300,000 for the tuition and equipment for these seven students. Of the over $300,000 that STEVENS charged the VA, the VA paid approximately $83,000 directly to STEVENS, including the aforementioned payments for the tuition of VETERAN 1.

32.     The balance of the payments charged to the VA by Stevens were not paid by the VA due to the VA's ongoing administrative investigation into Eelon following complaints by students about the poor quality of education at Eelon. In an effort to procure the outstanding

payments from the VA, STEVENS made numerous fraudulent misrepresentations to the VA, and maintained fraudulent student files in the event of an audit by the VA.  For example:

a.  STEVENS created "Certificates of Completion" for VETERAN 1, which showed that he completed the Health Practitioner 1 course on June 4, 2016 and the Health Practitioner 2 Course on December 20, 2016.  Despite this, she submitted invoices and VA Form 1905s for VETERAN 1 to take the latter course in January 2017.

b.  On September 13, 2017, STEVENS emailed to the VA an "attendance" sheet for eight students.  The attendance sheet was created by STEVENS and included handwritten check marks purporting to represent the dates that the students attended class.  In fact, as STEVENS well knew, the students had not attended class on many of those dates nor was class even held on many of those dates.

c.  STEVENS maintained student files for each enrolled student at Eelon Training Academy.  These files contained the attendance sheets for each student similar to the ones that STEVENS submitted to the VA on September 13, 2017.  The packets also included course schedules, program outlines, and syllabi that inflated the number of hours and the level of education that each student would, or in fact, could, receive.  The student files also contained Student Progress and Grading Reports that included grades for classes that the students did not take or attend.

d.  STEVENS submitted invoices to the VA that listed equipment that each student purportedly needed for the Digital Media Course at Eelon Training

Academy. In fact, STEVENS did not procure the items that were listed on the invoices for each student, and did not know why those items were necessary for the course.

33.     When STEVENS submitted documentation to the VA requesting payment, she did so knowing that the students who were approved to attend her school would receive a stipend from the VA for attending class. As a result of STEVENS' fraud, the VA paid students approximately $33,000 in stipends for attending Eelon Training Academy.

## COUNT ONE
### (Bribery – 18 U.S.C. § 201(b)(1))

34.     The allegations set forth in paragraphs one through thirty-three of this Information are incorporated by reference as if fully stated herein.

35.     From in or about March 2016 and continuing through in or about January 2018, in the District of Columbia, and elsewhere, the defendant,

**MICHELLE STEVENS,**

did, directly and indirectly, corruptly give, offer, and promise a thing of value to a public official, to influence any official act, to influence such public official to commit and aid in committing, and to collude in, and allow, any fraud, and to make opportunity for the commission of any fraud on the United States; that is, STEVENS gave PUBLIC OFFICIAL 1 cash money in exchange for PUBLIC OFFICIAL 1's performance of official acts favorable to Eelon Training Academy and STEVENS, as described in paragraphs twenty through twenty-six, and for PUBLIC OFFICIAL 1's aid in committing a fraud on the VA, as described in paragraphs sixteen through twenty-eight.

(All in violation of Title 18, United States Code, Section 201(b)(1))

10

## FORFEITURE ALLEGATION

36.     Upon conviction of the offense alleged in Count One, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to this offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).  The United States will also seek a forfeiture money judgment against the defendant in the amount of $83,000.

37.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond he jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value described above, pursuant to Title 21, United States Code, Section 853(p).

(**Criminal Forfeiture**, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p))

JESSIE K. LIU
United States Attorney
For the District of Columbia

By: _____

Sonali D. Patel
Assistant United States Attorney

ANNALOU TIROL
Acting Chief, Public Integrity Section

By: _____

Simon J. Cataldo
Trial Attorney